**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

ALLISON  CARTER,                                )
                                               )
               Plaintiff,              )
                                               )
               v.                    )          Case No. 1:10-cv-01670-TWP-TAB
                                               )
ELI LILLY  & COMPANY,                          )
                                               )
              Defendant.            )

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on Defendant Eli Lilly & Company's ("Lilly") Motion for Summary Judgment (Dkt. 53).  Plaintiff Allison Carter ("Ms. Carter"), an African-American woman, filed this action against Lilly alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("§ 1981"), based upon allegations that, throughout her seven year tenure with the company, Lilly classified her in lower paying positions than her white co-workers, even though she claims she did substantially the same work.[1]  Ms. Carter also claims that she was subjected to a hostile work environment on the basis of her race in violation of Title VII.  For the reasons set forth below, Lilly's Motion for Summary Judgment (Dkt. 53) is **GRANTED**.

**I.   BACKGROUND**

The following material facts are undisputed and reflect evidence in the light most reasonably favorable to Ms. Carter, the non-moving party.  *See Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 728 (7th Cir. 2011).

---

[1] Ms. Carter's Complaint also contained a "failure to promote" claim, alleging that white co-workers were afforded more opportunities for promotion; however, in light of discovery obtained in the case, Ms. Carter has abandoned those claims.  Dkt. 63 at 21 n.9.

**A.      Production Technician Position**

Ms. Carter began working for Lilly, a global pharmaceutical manufacturing company, on April 17, 2000 as a "Production Technician 1" in its Manufacturing Department in Greenfield, Indiana.  She was initially classified as a Pay Level 26 employee with a starting annual salary of $28,560.00.  Within one month, Lilly elevated Ms. Carter to the position of "Operator/Technician" at Pay Level 28, and increased her annual salary to $30,000.00.  She received positive performance evaluations from her supervisor, David Sutherland.

Ms. Carter alleges that she was first subjected to a hostile work environment at Lilly while working in this position arising from a single incident that occurred at a restaurant.  While she was assigned to the Manufacturing Department, Ms. Carter attended a departmental function organized and paid for by Lilly.  At the restaurant, a waitress refused to serve Ms. Carter and two other African-American Lilly employees, and another restaurant employee told them that it was because the waitress refused to serve Blacks.  Ms. Carter and her two African-American colleagues voluntarily left the restaurant, but the rest of the department stayed and continued the event.

**B.      Preventative Maintenance Mechanic Position**

After working as an Operator Technician/Production Technician for approximately 18 months, Ms. Carter discovered that she was allergic to the drug that she was handling.  As a result, Lilly placed Ms. Carter on "medical redeployment status" and gave her time to search for a new position within the company.  In April 2002, Ms. Carter transferred to a new position as a Preventative Maintenance Mechanic ("PM Mechanic") in Lilly's Maintenance Engineering and Standards Laboratory (the "Corporate Standards Lab") at its Indianapolis, Indiana facilities.  She remained at the Corporate Standards Lab at Pay Level 28 until August 2004, and after a series of

merit increases her ending salary was $35,760.00.  As a PM Mechanic, Ms. Carter was primarily responsible for calibrating instruments on which she was trained.  Charles Andrew served as her direct supervisor through the end of 2003, and in January 2004 Sandra Funk replaced Mr. Andrew as Ms. Carter's supervisor.

Ms. Carter alleges that the two employees similarly situated to her during her time at the Corporate Standards Lab were Andrew Richie ("Mr. Richie") and Anthony Hamilton ("Mr. Hamilton").[2]  When Ms. Carter joined the Corporate Standards Lab, Mr. Richie, a white male, was classified as an Instrument Technician at Pay Level 32 with an annual salary of $42,600.00, and in March 2003 he was promoted to Instrument Engineer, Pay Level 50, with an annual salary of $56,280.00.  While he was an Instrument Technician, Mr. Richie was also supervised by Mr. Andrew.  Both the PM Mechanics and the Instrument Technicians were expected to perform calibrations; however, in contrast to PM Mechanics, Instrument Technicians were expected to perform calibrations across a wider range of equipment, troubleshoot more complex problems, and to address equipment issues in greater depth.

Mr. Hamilton, also a white male, was classified as a Senior Instrument Technician at Pay Level 36 with an annual salary of $44,040.00 at the time Ms. Carter joined the Corporate Standards Lab.  There was some overlap between the PM Mechanic's responsibilities and the Senior Instrument Technician's responsibilities in that both performed scheduled preventative maintenance and non-scheduled maintenance.  However, Senior Instrument Technicians were expected to perform the duties of the Instrument Technician, and additionally expected to know how to calibrate all equipment in the laboratory.  In addition, the PM Mechanic was expected to complete more orders than an Instrument Technician because the type of work completed by an

---

[2] Lilly refers to a third employee, John Bush, who worked as a Pay Level 40 Technician/Specialist Engineer.  Dkt. 54 at 4.  However, Ms. Carter only addresses Mr. Richie and Mr. Hamilton in her response brief, so the Court will presume that these are the employees that she considers to be similarly situated to her.  Dkt. 63 at 9-11.

Instrument Technician could take longer.  While Ms. Carter worked as a PM Mechanic, Mr. Hamilton made a lateral move from the Corporate Standards Lab to Maintenance Engineering, which was located in a different building than the Corporate Standards Lab and serviced different internal Lilly customers.  However, he was supervised by both Mr. Andrew and Ms. Funk at the same time as Ms. Carter.

Lilly considered each of these positions distinct and the criteria for each employee's position determined his or her performance expectations, as well as qualified the employees for different in-line promotions.  In addition to the differing expectations, Ms. Carter, Mr. Richie and Mr. Hamilton also had differing levels of experience and education.  Ms. Carter had an Associate's degree in paralegal studies and certification for underwater warfare engineering, and came to Lilly with 18 years of experience in clerical work, production and manufacturing.  She did not complete her Bachelor's degree until 2004.  Mr. Richie had a Bachelor of Science degree in chemistry with a minor in mathematics.  Mr. Hamilton had experience performing some engineering duties, reading and understanding technical documents, and was expected to perform calibrations on all equipment at the time Ms. Carter joined the Corporate Standards Lab.  Despite these differences, Ms. Carter argues the work that she, Mr. Richie and Mr. Hamilton performed was similar enough that their higher rank and salary could only be attributed to her race.

Ms. Carter also alleges that she was subjected to harassment while she worked in the Corporate Standards Lab.  In or around May 2002, Ms. Carter complained that another co-worker, John Bush, yelled at her and called her a "dummy" when she allegedly refused to modify an instrument's calibration records.  She believed Mr. Bush's comments were motivated by race, though his comments contained no references to race.  Ms. Carter reported the incident to her supervisor, Mr. Andrew, to his superiors, and to Human Resources.  That same day, Human

4

Resources Representative Timothy Hudson responded to Ms. Carter's e-mail complaint and scheduled a meeting with her to investigate the matter.  Mr. Andrew met with Mr. Bush and counseled him on his need to improve his working relationship with Ms. Carter, and Mr. Bush apologized to Ms. Carter.

In another incident, Eric Moline, a white non-supervising employee, called Ms. Carter and another African-American co-worker "monkeys" in front of a number of colleagues, but she does not recall any other specifics about the statement.  She also says that Mr. Moline and another contractor made racial and sexual jokes around her, but again does not recall the specifics of the jokes or how many times she heard the jokes.  Additionally, Ms. Carter reports that a white Lilly contractor, James Allman, made offensive jokes regarding religion and sexual orientation, and made discriminatory comments about African-Americans and Mexicans.  However, Ms. Carter also did not recall the specifics of the comments made by the Lilly contractor, and only vaguely recalled that he made "some kind of racial joke."  Dkt. 63-2 at 188-89, 316:24-317:2.  Ms. Carter reported these incidents to her supervisor and to Human Resources.  Lilly's investigation concluded that the behavior did take place and claims that appropriate action was taken.

## C.    Training Assistant Position

In August 2004, Ms. Carter transferred to a new position as a Training Assistant in the Bioproducts Research and Development Group in Virginia after she complained of an allergic reaction to dust from construction near the Corporate Standards Laboratory.  Debra Brush hired Ms. Carter at Pay Level 28 and was her first supervisor in the position, but thereafter her supervisor was changed to Melinda Griffin ("Ms. Griffin").   As a Training Assistant, Ms. Carter worked with SAP/LEADS, the system used to administer training, and her duties involved

entering training credit into the system, organizing the training record library, grading tests for various courses, and scheduling training courses.  Ms. Carter's salary remained at the level of her previous position of $35,760.00, and after a merit increase in March 2005 she earned an annual salary of $36,779.00.

Ms. Carter alleges that the individual whose position was most similar to hers was Kathy Sutton, a white female, who was classified as a Training Specialist.  Ms. Sutton also reported to Ms. Griffin.  The Training Specialist was responsible for putting course content into the training system, linking course content with individual training plans, and assisting with developing some on-the-job training checklists.  The primary difference between the Training Assistant and Training Specialist positions was that the Training Assistant's job involved more data entry, whereas the Training Specialist's job involved greater interaction with the more senior Training Associates in order to ensure training courses were put into the training system and assigned to the appropriate individuals.  Occasionally, both the Training Assistant and the Training Specialist would both have to enter course information, course completion information or scheduling courses in the system if the workload necessitated doing so.  Ms. Sutton was at Pay Level 40 and earned a salary of $44,220.00 as of July 2004, and in March 2005 her salary increased to $45,365.00.  Ms. Sutton had previously worked as a Training Assistant for two years prior to being promoted to the Training Specialist position.  Ms. Carter alleges that she increasingly took on Ms. Sutton's duties because of her proficiency with Lilly's training systems and attention to detail.

Ms. Carter claims that she continued to be subjected to a racial harassment while in her position as a Training Assistant.  Ms. Griffin frequently yelled at her and told Ms. Carter to ask each person after every meeting if Ms. Carter had said anything to offend them, although she did

not ask any other employees to do so.  Ms. Carter also claims that Ms. Griffin suggested that Ms. Carter select an African-American mentor, Merleen Lashley, even though Ms. Lashley worked in a different department.  Ms. Carter reported to Ms. Griffin that she overheard Ms. Sutton speaking about Ms. Carter in a "disrespectful manner," but Ms. Griffin believed Ms. Sutton's version of the events that Ms. Sutton was referring to someone else.  Ms. Sutton later told Ms. Carter that she disapproved of her son dating an African-American woman because of her race.  Ms. Carter also reported this comment to Ms. Griffin, but Ms. Griffin did not follow up on it.  Ms. Griffin denied Ms. Carter's requests for additional training and gave negative recommendations regarding Ms. Carter's interpersonal and communication skills to other hiring managers when Ms. Carter was seeking other positions within the company.

## D.    Training Specialist Position

In late 2005, Ms. Carter developed another allergic reaction, resulting in a third medical redeployment.  In January 2006, Ms. Carter accepted a position as a Training Specialist in Lilly's Manassas, Virginia facility, which was at Pay Level 40.  She worked under the supervision of Christine McPherson.  Ms. Carter alleges that she was subjected to a racially hostile work environment based upon an incident that occurred at a company picnic in May or June 2006.  For the duration of the picnic, a white co-worker, Todd Troutman, wore a modified chef hat pulled down over his face with holes cut out for the eyes and nose and a white apron, which to Ms. Carter, resembled a Ku Klux Klan ("KKK") hood and robe.  The co-worker called himself the "surprise chef."  A group photo was taken of the "surprise chef" and other Lilly employees and included in the company's newsletter, the Pennacle.  Lilly later collected the newsletter and distributed a revised version that omitted the photograph.  Ms. Carter did not file a formal complaint about the incident, claiming that the Human Resources department attended the picnic

and everyone was aware that Mr. Troutman was wearing the "hood" and apron.  Aside from the

revision to the company newsletter, Lilly took no further action as a result of the incident.

Additional facts are added below as needed.

## II.  <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d

487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews

"the record in the light most favorable to the nonmoving party and draw[s] all reasonable

inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation

omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest

on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is

a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation

omitted). "In much the same way that a court is not required to scour the record in search of

evidence to defeat the motion for summary judgment, nor is it permitted to conduct a paper trial

on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and

internal quotations omitted). "[N]either the mere existence of some alleged factual dispute

between the parties … nor the existence of some metaphysical doubt as to the material facts … is

sufficient to defeat a motion for summary judgment."  *Chiaramonte v. Fashion Bed Group, Inc.*,

129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

### III.  DISCUSSION

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Ms. Carter has also alleged discrimination in violation of 42 U.S.C. § 1981, which prohibits racial discrimination in the creation and enforcement of contracts.  The applicable legal standards on liability for race discrimination are the same under Title VII and § 1981.  *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004); *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1028 (7th Cir. 2004).  Lilly has moved for summary judgment on all claims in Ms. Carter's Complaint, and her disparate pay and hostile work environment claims are each addressed below.

### A.    Disparate Pay Claims

Title VII prohibits an employer from discharging or discriminating against an employee "with respect to [her] compensation, terms, conditions or privileges of employment, because of [her] ... race."  42 U.S.C. § 2000e–2(a)(1).  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts … as is enjoyed by white citizens."  42 U.S.C. § 1981.  Plaintiffs alleging discrimination under Title VII or § 1981 may prove such discrimination using either the direct or indirect method of proof.  *Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 849–50 (7th Cir. 2008).  The direct method requires that the plaintiff produce evidence that the defendant was motivated by *animus* toward a protected class when she suffered some adverse employment action.  *Id.*  If a plaintiff cannot present direct evidence of discrimination, she may pursue her claim using indirect evidence.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the indirect method, a *prima facie* case for race discrimination resulting in disparate pay requires a showing that: (1) the plaintiff is a member of a protected class; (2) she was performing at a level expected by her employer from one in such a position; and (3) she suffered an adverse employment action, in that she was paid a lower salary than a "similarly situated" non-protected class member. *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 274 (7th Cir. 2004). If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a non-discriminatory reason for the adverse employment action. *Sun v. Bd. of Trs. of the Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007). If the defendant does so, the burden shifts back to the plaintiff to submit evidence demonstrating that its explanation is pretextual. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). To establish pretext, a plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in [defendant's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [defendant] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). Because Ms. Carter has offered no direct or circumstantial evidence in accord with the direct method to establish his disparate pay discrimination claim, she must rely upon the indirect method.

The parties do not dispute that Ms. Carter has shown that she satisfies the first two elements of her *prima facie* case. First, she is a member of a protected class as an African-American. Second, she has shown that she was meeting her employer's legitimate employment expectations, as evidenced by her raises and satisfactory performance evaluations. The primary point of contention between the parties is whether Ms. Carter raises sufficient questions of fact regarding whether her co-workers, Andrew Richie, Anthony Hamilton, and Kathy Sutton, were

10

"similarly situated" such that Ms. Carter can satisfy the third prong of her *prima facie* case, making summary judgment in favor of Lilly inappropriate.

"Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that the plaintiffs have met their burden on the issue." *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012) (internal quotations and citations omitted).  "Which factors are material is a case-specific inquiry that depends on the specifics of the defendant's decision and the stated reason for it." *Good v. Univ. of Chic. Med. Ctr.*, 673 F.3d 670, 675–76 (7th Cir. 2012).  There is no definitive formula for making this determination; rather, courts must examine "all relevant factors, including whether the employees '(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications – provided the employer considered these latter factors in making the personnel decision.'" *Warren v. Solo Cup Co.*, 516 F.3d 627, 631 (7th Cir. 2008) (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (additional citations omitted)).  Formal job titles or rank are not dispositive; rather, the key inquiry is whether the comparators were subject to the same standards.  *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011).  "The question is whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis."  *Luster*, 652 F.3d at 730.

### 1.     Preventative Maintenance Mechanic Position

Ms. Carter argues that her white co-workers, Mr. Richie and Mr. Hamilton, were classified into higher ranking positions—thus receiving higher pay—despite the fact that she and they did substantially the same work, suggesting that her lower classification and pay were

attributable to her race.  In its brief, Lilly only addressed Ms. Carter's disparate pay claim as it relates to her position as a Training Assistant, not a PM Mechanic.  *See* Dkt. 54 at 15-16.  Lilly, in its reply brief, addresses this oversight by claiming that it did not know that Ms. Carter was asserting a disparate pay claim and was not required to address a non-cognizable "comparative pay" claim.  Dkt. 68 at 7-8. This does not explain, however, how Lilly was able to clearly address Ms. Carter's disparate pay claim as it relates to her position as a Training Assistant.  Dkt. 54 at 15-16.  In her Complaint, Ms. Carter clearly alleges facts supporting a disparate pay claim for the time period while she worked as a PM Mechanic by alleging that white colleagues were "paid more than her in bonus/incentive pay despite comparable performance while doing comparable work."  Dkt. 1 at 2.  The argument that Lilly could not discern this as a disparate pay allegation – while determining that factual allegations stating "Ms. Carter was paid less than a white female colleague who performed similar work" did state such a claim—is unavailing.

However, while it is true that, as a general rule, if a moving party does not raise an issue in support of its motion for summary judgment, such an issue is waived, *see Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006), Lilly has still addressed the key point of contention in Ms. Carter's *prima facie* case, namely that Ms. Carter, Mr. Richie, and Mr. Hamilton are not similarly situated and are therefore not proper comparators.  Likewise, Ms. Carter was afforded the opportunity to respond and put forth evidence to argue that there is a genuine issue of material fact as to whether these individuals were similarly situated.  *See* Dkt. 63 at 24-28.  The Court will not allow this particular disparate pay claim to go forward to trial on such a technicality, particularly considering the Court's finding that Ms. Carter has not established a sufficient *prima facie* case of race discrimination on her disparate pay claim.

Turning to the issue at hand, Ms. Carter has not shown that there is a genuine issue of material fact as to whether she has satisfied the third prong of her *prima facie* case because she cannot show that Mr. Richie and Mr. Hamilton were "similarly situated" employees.  Ms. Carter satisfied only one requirement—that both positions report to the same supervisor—at least initially for her comparison with Mr. Richie while he was an Instrument Technician, and during the entire time she worked in the Corporate Standards Lab with Mr. Hamilton.  Where Ms. Carter fails, however, is in showing that the PM Mechanic, the Instrument Technician, and Instrument Engineer had the same job description, were subject to the same standards, and that they all had comparable education and experience.  Although Lilly admits there was some overlap between the duties of the three positions, Ms. Carter even acknowledges that some of their duties differed.  Dkt. 63 at 9.  There were also differing expectations for the Instrument Technician and Instrument Engineer positions than the PM Mechanic position, including the expectation that they perform calibrations across a wider range of equipment, troubleshoot more complex problems, and address equipment issues in greater depth *in addition to* performing the calibrations performed by the PM Mechanic.

In addition, Ms. Carter, Mr. Richie and Mr. Hamilton had differing levels of experience and education.  While Ms. Carter had no prior engineering experience, Mr. Hamilton had already been performing some engineering duties by the time Ms. Carter joined the Corporate Standards Lab.  Additionally, Mr. Richie held a BS in chemistry with a minor in mathematics, whereas Ms. Carter held an associate's degree in paralegal studies.  While Ms. Carter only disputes that these qualifications were "superior" to her own, she does not offer any explanation as to why the differences in their qualifications and experience were irrelevant to Lilly's hiring and classification decisions.  Because the parties do not dispute that each of the positions in the

Corporate Standards Lab had different performance expectations and that there was only some overlap in their duties, the Court finds that no reasonable fact-finder could find that Ms. Carter was similarly situated to Mr. Richie and Mr. Hamilton.  Therefore, Lilly is entitled to summary judgment on Ms. Carter's disparate pay claim during her time as a PM Mechanic.

### 2.    Training Assistant Position

Ms. Carter also cannot show that there is a dispute of material fact as it relates to whether Ms. Sutton was a similarly situated employee, satisfying the third prong of Ms. Carter's *prima facie* case for disparate pay while working as a Training Assistant.  When Ms. Carter joined the training department, Ms. Sutton had already worked as a Training Assistant for two years and had been promoted to the Training Specialist position, the same position that Ms. Carter was also promoted to less than two years later after working as a Training Assistant.  In addition, there were distinctions between the duties and expectations of a Training Assistant and a Training Specialist, including the fact that the Training Assistant position involved more data entry, and the Training Specialist's job involved greater interaction with the more senior Training Assistants to ensure training courses were put into the training system and assigned to the right people.  Even assuming that Ms. Carter excelled in her position as a Training Assistant by learning Lilly's electronic training system quickly and gradually assuming some of the duties of the Training Specialist, this does not mean that Ms. Carter can prove her *prima facie* case by showing that she was similarly situated to Ms. Sutton.  An employer should not be held liable for hiring an employee who later turns out to be more proficient than a more experienced and senior ranking employee.  At the time she was hired as a Training Assistant, Ms. Carter had no relevant experience, but as she gained experience she was eventually rewarded with a promotion to Training Specialist, just as Ms. Sutton was after first working as a Training Assistant.  There was

enough difference between the duties and experience levels of Ms. Carter and Ms. Sutton such that no reasonable fact-finder could conclude that the two were similarly situated. Therefore, Lilly is entitled to summary judgment on Ms. Carter's disparate pay claim relating to her time as a Training Assistant.

**B.      Hostile Work Environment Claims**

Ms. Carter alleges that she was subjected to a racially hostile work environment during the tenure of each of her positions with Lilly. Hostile environment claims based on racial harassment are reviewed under the same standards as sexual harassment. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002). In order to prevail on a hostile work environment claim, the plaintiff must show that the conduct at issue "was both subjectively and objectively so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004) (quotations omitted). "'[R]elatively isolated' instances of non-severe misconduct will not support a hostile environment claim." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993).

To get past summary judgment on a hostile work environment claim, Ms. Carter must provide sufficient evidence to create a material issue of fact as to four elements: (1) the work environment was both subjectively and objectively offensive; (2) her race was the basis for the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for Lilly's liability. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). When evaluating a hostile work environment claim, courts will not focus on discrete acts of individual employees, but must consider the entire context of the workplace. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). "To support a hostile work environment claim, the plaintiff need not show that

the complained-of conduct was explicitly racial, but must show it had a racial character or purpose." *Id.*

An employer is not automatically liable for harassing behavior by coworkers; rather, employers are only liable where they do not "promptly and adequately respond to employee harassment." *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994 (7th Cir. 2011).  While "not every preventive measure will be a proper remedy… [t]he question is instead whether [the employer's] response to the harassment was a reasonable one, designed to remedy the illegal harassment, or a negligent one that did not adequately respond to the situation in its midst." *Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999).  However, "[w]hat is reasonable depends on the gravity of the harassment."  *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1995).

Ms. Carter cannot show that the incidents cited, taken either individually or collectively, constitute a racially hostile work environment.  A series of incidents will be considered part of the same actionable hostile work environment practice where they involve "the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers."  *Morgan*, 536 U.S. at 120.  Where a series of acts are not sufficiently similar in nature, frequency and severity, courts have found that each act constitutes a different employment practice.  *See, e.g., Wilkie v. Dept. of Health & Human Svcs.*, 638 F.3d 944, 951-52 (8th Cir. 2011) (finding that alleged misconduct in 2004, consisting of sexual advances, and non-sexual acts by the same individual in 2005 were not too similar in nature, frequency, and severity so as to comprise single hostile work environment); *Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1349 (11th Cir. 2007) (finding discrete acts relating to promotion and retaliation insufficiently related to hostile work environment acts of "discriminatory intimidation, ridicule,

and insult" to comprise part of that claim); *cf. Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386-87 (7th Cir. 2007) (acts of co-worker harassment occurring during plaintiff's tenure on different work teams in same production facility held part of same hostile work environment practice where plaintiff was subjected to sexual comments and sounds on both teams and unavailingly reported conduct to same chain of managers). Harassing conduct need not be both severe and pervasive; one instance of conduct that is sufficiently severe may be enough to constitute hostile work environment harassment. *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). Ms. Carter alleges that harassment occurred while working in four separate jobs in four separate locations with four separate sets of supervisors and co-workers, thus the Court concludes that the nature of the conduct is sufficiently different and the alleged incidents do not constitute a single coherent hostile environment claim. Additionally, the Court finds that the individual incidents cited by Ms. Carter are not sufficiently severe to constitute hostile environment discrimination on their own. Each set of allegations will be addressed in turn below.

### 1.      The Greenfield, Indiana restaurant incident

Ms. Carter alleges that the corporate event at which a waitress refused to serve her and two African-American co-workers during the time she worked as a Production Technician created a racially hostile workplace.[3] This incident does not satisfy any of the requirements for such a finding. The incident occurred at a public restaurant, not the workplace, and was perpetuated by someone completely unrelated to Lilly. The fact that the other Lilly employees

---

[3] Lilly argues that this incident falls outside of the statute of limitations for both Title VII and § 1981 and thus should not be considered. However, the Court is considering the incident only to analyze whether it should be considered as part of "ongoing harassment." Courts may consider discrete acts that fall outside of the statute of limitations where the series of separate acts collectively constitute one "unlawful employment action," and the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. *Morgan*, 536 U.S. at 116-17.

decided to stay at the restaurant does not qualify this as an objectively offensive act such that it was "abusive," nor was it severe or pervasive or alter the conditions of Ms. Carter's work environment.  Finally, there is no basis for Lilly's liability because the harassment was not perpetuated by Ms. Carter's coworkers or supervisor; Lilly cannot be held responsible for an offensive waitress or Ms. Carter's coworkers' inaction in not leaving the restaurant with her and the other employees.

### 2.     Incidents in the Corporate Standards Lab

Ms. Carter alleges that three incidents that occurred while she worked in the Corporate Standards Lab created a racially hostile working environment.  First, she alleges that a co-worker yelled at her and called her a "dummy" for failure to modify an instrument's calibration. Second, she alleges that a non-supervising employee referred to her and another African-American employee as "monkeys" but does not recall the specifics or context of the statement. Third, Ms. Carter alleges that a Lilly contractor made discriminatory jokes regarding race, religion and sex, but also does not recall what was said or how many times it was said.

Again, these incidents do not rise to a sufficient level of severity to constitute a hostile work environment, either collectively or individually.  With regard to being called "dummy" by a co-worker, Ms. Carter has not shown, aside from her own speculation, that this comment had anything to do with her race and, in any event, Lilly addressed the incident and counseled the co-worker on his behavior.  Even accepting Ms. Carter's assertion that the "monkey" comment and the offensive jokes did relate to her race, she has not shown that they were severe or pervasive enough to alter the conditions of her employment.  Ms. Carter cannot even recall the specifics or the context of the statements and jokes, calling into question how even subjectively severe she considered these acts and demonstrating the isolated nature of the conduct.  *See Smith v.*

*Northeastern Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) ("One utterance alone does not create an objectively hostile work environment."); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) ("The occasional vulgar banter … of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable." (internal quotations and citations omitted)).

### 3.      Incidents in the Training Department

Ms. Carter next alleges that she was subjected to a racially hostile work environment while under the supervision of Ms. Griffin during her tenure as a Training Assistant.  Ms. Carter claims that Ms. Griffin frequently yelled at her, told her to ask co-workers if she had offended them, suggested that she seek out a specific mentor who was African-American, denied her training, and gave negative assessments of her leadership skills to potential hiring managers. Another employee, Ms. Sutton, expressed her disagreement with interracial dating, and spoke about Ms. Carter in a disrespectful manner.   Nowhere does Ms. Carter show that any of Ms. Griffin's actions were related to her race, nor does she show that they altered the conditions of her work environment any more than the conduct of the typical unpleasant coworker.   Though Ms. Sutton's comment about her son may have been related to race, Ms. Carter has not shown that it was specifically directed towards her or expressed anything more than a personal bias. Ms. Carter has not shown that Ms. Griffin's or Ms. Sutton's conduct was objectively severe or pervasive such that a reasonable fact-finder could conclude that she was subjected to a hostile work environment based upon her race.

### 4.      The incident at the Prince William County picnic

Finally, Ms. Carter argues that the incident that occurred while she was working as a Training Specialist at the Prince William plant in Virginia where a co-worker wore a modified chef hat over his head and a white apron created a hostile working environment.  Even accepting

Ms. Carter's version of the events that the hat and apron worn by the "surprise chef" was intended to resemble a KKK hood and robe, Ms. Carter cannot show that Lilly can be held liable because she failed to report the incident to her supervisors.  In order to be held liable for racial harassment by a co-worker, the employer must have been negligent in reasonably responding to employee harassment.  *Sutherland*, 632 F.3d at 994.  Ms. Carter claims that she did not complain about the incident because it occurred within full view of the Human Resources department; however, even Ms. Carter acknowledges that the employee referred to himself as the "surprise chef" and there are no other allegations that he engaged in any other behavior suggesting that he was imitating a member of the KKK that would have made Lilly aware that objectively harassing conduct was occurring.  While the "surprise chef" costume may have been in poor taste, it would be unreasonable to expect that Lilly management would automatically assume that a man in a chef hat and apron at a cookout was intended to be a racially inflammatory symbol, absent a complaint from someone who was subjectively offended.  The fact that Lilly subsequently removed the picture of the "surprise chef" from the company newsletter without Ms. Carter's complaint does not indicate that Lilly knew the incident was offensive at the time it occurred; it is likely that they were trying – apparently unsuccessfully – to avoid the very sort of lawsuit that is presently before this Court.

The Court finds that these incidents cited by Ms. Carter are sufficiently isolated and non-severe as a matter of law that she cannot make out a *prima facie* case of hostile work environment discrimination.  Thus, Lilly is entitled to summary judgment on Ms. Carter's hostile work environment claims.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that Ms. Carter has not raised any issues of material fact with regard to proving her *prima facie* case of disparate pay or hostile work environment discrimination on the basis of her race under either Title VII or §1981, and she has abandoned her failure to promote claims.  Therefore, Lilly's Motion for Summary Judgment (Dkt. 53) on all counts of Ms. Carter's Complaint is **GRANTED**.

SO ORDERED.

Date: ___02/01/2013___

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Sandra L. Blevins
BETZ & ASSISTANTS
sblevins@betzadvocates.com

Benjamin C. Ellis
BETZ & BLEVINS
bellis@betzadvocates.com

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Jamenda A. McCoy
FAEGRE BAKER DANIELS LLP - Chicago
jamenda.mccoy@gmail.com

Craig M. Borowski
FAEGRE BAKER DANIELS LLP - Indianapolis
craig.borowski@faegrebd.com

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP - Indianapolis
ellen.boshkoff@faegrebd.com

Robert Thomas Dassow
HOVDE DASSOW & DEETS LLC
rdassow@hovdelaw.com

Ada N. Orakwusi
MORELLI RATNER PC
aorakwusi@morellilaw.com

Benedict P. Morelli
MORELLI RATNER, PC
bmorelli@morellilaw.com

David S. Ratner
MORELLI RATNER, PC
dratner@morellilaw.com

Martha M. McBrayer
MORELLI RATNER, PC
mmcbrayer@morellilaw.com

Matthew Louis Schmid
SANFORD HEISLER, LLP
mschmid@sanfordheisler.com

Sharon Yvette Eubanks
SANFORD WITTELS & HEISLER LLP
seubanks@swhlegal.com

Kristen L. Walsh
SANFORD WITTELS & HEISLER, LLP
kwalsh@swhlegal.com